**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| CORRIE WRIGHT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION |
| v. ) | |
| ) | No. 11-2404-KHV |
| CITY OF TOPEKA, KANSAS ) | |
| ) | |
| Defendant. ) | |
| _____) | |

**MEMORANDUM AND ORDER**

Plaintiff brings suit against her employer, The City of Topeka, alleging retaliatory treatment for exercising her rights under the Family Medical Leave Act, 29 U.S.C. § 2611 ("FMLA"), and discriminatory treatment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. She asserts that defendant failed to promote her in retaliation for utilizing FMLA leave and because of her gender.[1]  Defendant asserts that it did not select plaintiff for the position for which she applied because another applicant was better qualified, and denies retaliatory and discriminatory intent. This matter comes before the Court on Defendant City Of Topeka's Motion For Summary Judgment (Doc. #27) filed March 30, 2012. For the following reasons the Court sustains defendant's motion.

**Legal Standards**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535,

---

[1] Plaintiff also brought a claim for retaliation in violation of the Americans with Disabilities Act, but she has abandoned that claim. Doc. #34 at p. 1.

-1-

1538-39 (10th Cir. 1993). A "genuine" factual dispute is one "on which the jury could reasonably find for the plaintiff," and requires more than a mere scintilla of evidence. Liberty Lobby, 477 U.S. at 252. A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Id. at 248.

The moving party bears the initial burden of showing that there are no genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Justice v. Crown Cork & Seal Co., 527 F.3d 1080, 1085 (10th Cir. 2008). Once the moving party meets its burden, the burden shifts to the nonmoving party to show that a genuine issue remains for trial with respect to the dispositive matters for which she carries the burden of proof. Nat'l Am. Ins. Co. v. Am. Re-Ins. Co., 358 F.3d 736, 739 (10th Cir. 2004); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). As to these matters, the nonmoving party may not rest on her pleadings but must set forth specific facts. Fed. R. Civ. P. 56(e)(2); Matsushita, 475 U.S. at 586-87; Justice, 527 F.3d at 1085. Conclusory allegations not supported by evidence are insufficient to establish a genuine issue of material fact. Jarvis v. Potter, 500 F.3d 1113, 1120 (10th Cir. 2007); see Kidd v. Taos Ski Valley, Inc., 88 F.3d 848, 853 (10th Cir. 1996).

When applying this standard, the Court must view the factual record in the light most favorable to the party opposing the motion for summary judgment. Duvall v. Ga.-Pac. Consumer Prods., L.P., 607 F.3d 1255, 1260 (10th Cir. 2010); see Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. Liberty Lobby, 477 U.S. at 250-51. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

**Facts**

The following facts are either uncontroverted, deemed admitted or construed in the light most favorable to plaintiff.

Plaintiff began employment with defendant in April of 2005 as Program Administrator in the Housing and Neighborhood Development Department ("HND"). When she applied for employment, she interviewed first with a panel of city personnel and then with HND Director Randy Speaker before the City offered her the position. Effective January 1, 2007, defendant reclassified plaintiff's position to HND Manager due to her increased responsibilities and supervisory duties.[2] In January of 2010, defendant again reclassified plaintiff's position because she had higher levels of responsibility. In both instances, plaintiff's salary increased.

On March 12, 2010, plaintiff inquired whether FMLA would cover leave for her to donate a kidney, and 13 days later she made an FMLA leave request for such a procedure. On April 1, the Human Resources Department advised her that her physician's certification was not sufficiently detailed because it lacked estimated start and end dates for her medical procedure and recovery. Plaintiff made another FMLA leave request on July 21, and the Human Resources Department sent her another physician's certification form for completion. On September 23, after the National Kidney Registry notified plaintiff of a match for her kidney, plaintiff made her third FMLA leave request. Defendant approved plaintiff's FMLA leave beginning on September 30 and ending on November 10; plaintiff began her leave on September 30, and she returned to work on October 25. Plaintiff resumed work in the same position and department as when she left for FMLA leave.

The Deputy Director of HND, Kevin Rooney, retired just before plaintiff began her FMLA

---

[2] Plaintiff disputes that the change in her position was a reclassification rather than a promotion, but she relies only on her deposition testimony to that effect. She also admitted in her deposition that her job was reclassified, Doc. #34-1 at p. 3, and she does not dispute the City's Salary/Position Adjustment Form attached to Jacque Russell's affidavit which states that the change in position was a reclassification due to higher levels of responsibility. Doc. #28-2 at p. 12.

leave. Plaintiff acknowledges that Rooney had no authority to hire her as his successor and that Rooney never told her that he was training her for the position. However, plaintiff testified in her deposition that on numerous occasions she and Rooney discussed her moving into his position. Plaintiff also testified that between 2007 and January of 2010, she had three conversations with HND Director Speaker about her moving into the Deputy Director position. The first was in 2007, when plaintiff expressed her desire to have opportunities to advance, and Speaker told her that Rooney would be retiring. Plaintiff did not know the date of the second conversation, but testified that it was similar to the first. Rooney's retirement had not come when plaintiff expected it, and when she asked if she needed to look elsewhere, Speaker told her that Rooney would be retiring. The third conversation took place in Speaker's office in January of 2010 between Speaker, Rooney and plaintiff. Plaintiff testified that the conversation concerned her moving into the Deputy Director position, restructuring the office and who would replace her. In her deposition, plaintiff was unable to identify who said what at the meeting. Speaker testified that he could not recall ever having a conversation with plaintiff about moving into the Deputy Director position after Rooney retired, or any conversation with Rooney about training plaintiff for or plaintiff moving into the position after Rooney retired. Doc. #38-1 at p. 5.

When plaintiff returned to work following her FMLA leave, she perceived that Speaker treated her differently than he had before her leave. She testified as follows:

> When I came back Randy was very evasive. Before – you know, he has to walk by my office to get to his office and just about every time he would stop and say something or ask me about something or tell me to go to a meeting or, you know, anything. And when I came back after donating he barely even spoke to me. And I didn't get invited to extra meetings like I normally would. It was just – he was very evasive and I was suspicious that something was going on even before I found out that the job had been posted.

Doc. #34-1 at p. 13. Following Rooney's retirement, Speaker met with the City Manager and they determined that the best practice would be to publicly advertise and interview candidates for the

-4-

position of Deputy Director. Their decision was based on (1) the level of the position and (2) the interaction the person would have with other City departments as well as with the general public and particularly the neighborhood organizations. Although defendant asserts that it has no policy or requirement that it hire from within, plaintiff contends that the City Personnel Code states otherwise in the following passage:

> Vacancies in higher positions in the classified service shall be filled when possible by promotion from current City employees in lower classifications. Performance evaluations shall serve as one of the relevant factors to determine favorable candidates for promotion.

City of Topeka Personnel Code, Art. VI, § 1 (Doc. #34-4 at p. 37).[3] Human Resources Director Russell testified that, when possible, the City hires internally, but the process is designed to hire the best available candidate for the position. For higher management positions, she testified that the City uses a competitive internal and/or external selection process with panels conducting the interviews. (Doc. #28-3 at pp. 2-4). Panel interviews for positions such as a deputy director have been the practice of past and current City Administrators.

Speaker did not immediately post the vacancy following Rooney's retirement. One of the reasons he waited is that he knew plaintiff was interested in the position and he did not think it would be appropriate to post it or to have interviews take place while she was gone on FMLA leave.

For the Deputy Director interviews, Speaker decided to use two panels – an internal management panel and a community panel – with the former composed of designees of various City departments and the latter containing members of neighborhood organizations that had participated in the SORT (Stages of Resource Targeting) program that consumes 70 to 75 per cent of the department's time. Speaker did not interact with panel members because he did not want anyone to

---

[3] Plaintiff offers a version of the Code that was updated on September 19, 2011. The City filled the Deputy Director position in January of 2011. Defendant does not argue that the quoted language did not appear in the Code version in effect at the relevant time.

perceive that he was trying to sway the process. Instead, he relied on the panels to provide an unbiased analysis from people in different areas.

Plaintiff was aware that she was going to a panel interview, but she denies knowing that a second panel would interview her. The panelists asked the same questions of all of the candidates, and all candidates interviewed with both panels. A Human Resources representative was present during the internal management panel interviews. The panel members all filled out individual rating sheets and then met in their respective panels to arrive at separate recommendations, ranking each candidate. Both panels recommended Brad Reiff for the position, and both panels ranked plaintiff as their second choice. Speaker then interviewed Reiff and, after consulting with Human Resources and the City Manager, offered Reiff the position of Deputy Director based on his qualifications and the panels' unanimous recommendation. On January 25, 2011, Speaker told plaintiff in person that she did not get the job.

On April 1, 2011, plaintiff filed a complaint with the Equal Employment Opportunity Commission, asserting discrimination by defendant from September 1, 2010 through January 25, 2011. Plaintiff alleged discrimination due to not receiving the promotion to Deputy Director, basing it on her gender (female), race (Caucasian), age (35) and disability (temporary due to donating her kidney), and she also alleged retaliation.[4] On April 25, 2011, the EEOC issued plaintiff a right-to-sue letter, with a finding of no probable cause of discrimination by the employer. Plaintiff filed this action on July 23, 2011.

---

[4] Plaintiff does not allege race or age discrimination in this lawsuit.

**Analysis**

**I.    Retaliation**

As noted, plaintiff claims that defendant retaliated against her for taking FMLA leave. Defendant seeks summary judgment on plaintiff's retaliation claim, arguing that plaintiff has failed to: (1) show that defendant took an adverse action that a reasonable employee would have found materially adverse; (2) show a causal connection between the protected activity and the adverse action; and (3) rebut defendant's proffered non-retaliatory motive.

The FMLA makes it unlawful for an employer to discharge or in any manner discriminate against an individual for opposing a practice made unlawful by the FMLA. 29 U.S.C. § 2615(a)(2). The Tenth Circuit Court of Appeals has construed this provision as creating a retaliation theory of recovery. See Twigg v. Hawker Beechcraft Corp., 659 F.3d 987, 1004 (10th Cir. 2011). To state a prima facie case of retaliation, plaintiff must show that (1) she engaged in a protected activity; (2) defendant took an action that a reasonable employee would have found materially adverse; and (3) a causal connection exists between the protected activity and the adverse action. Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1171 (10th Cir. 2006). Retaliation claims under the FMLA are subject to the burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this analysis, plaintiff bears the initial burden of establishing a prima facie case of discrimination. Metzler, 464 F.3d at 1170. If plaintiff establishes a prima facie case, defendant has the burden to articulate a legitimate, nondiscriminatory reason for the adverse action. Satterlee v. Allen Press, Inc., 443 F. Supp. 2d 1236, 1245 (D. Kan. 2006). If defendant produces evidence of a legitimate reason, plaintiff may still prevail if she offers evidence that the articulated reason was a mere pretext for discrimination. Id. at 1245-46.

Defendant concedes the first element of a prima facie case, i.e. that plaintiff engaged in the protected activity of taking FMLA leave. As to the second element, defendant argues that summary

judgment is appropriate because plaintiff has failed to prove that the hiring process which resulted in Reiff's selection was an adverse action that a reasonable employee would have found materially adverse.[5] To establish adverse employment action, plaintiff must experience "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). The Tenth Circuit liberally defines adverse employment action. Hill v. Steven Motors, Inc., 97 Fed. Appx. 267, 278 (10th Cir. 2004); Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532 (10th Cir. 1998). Such actions are not simply limited to monetary losses in the form of wages or benefits. Sanchez, 164 F.3d at 532. The Tenth Circuit applies a "case-by-case" approach, examining the unique factors relevant to the situation before it. See Hill, 97 Fed. Appx. at 278; Sanchez, 164 F.3d at 532. Nevertheless, adverse employment action does not include "a mere inconvenience or an alteration of job responsibilities." Sanchez, 164 F.3d at 532 (citations and quotations omitted). As a matter of law, defendant's failure to promote plaintiff to the HND Deputy Director position is an adverse employment action.

As to the third element, defendant argues that no causal nexus exists between plaintiff exercising her FMLA rights and defendant failing to promote her to the Deputy Director position. Plaintiff may show a causal connection with evidence of circumstances which justify an inference of retaliatory motive, such as protected conduct followed closely by adverse action. Annett v. Univ. of Kan., 371 F.3d 1233, 1239 (10th Cir. 2004). Standing alone, temporal proximity between the protected activity and the retaliatory conduct must be very close in time. O'Neal v. Ferguson

---

[5] In the next section of its brief, however, defendant concedes that failure to promote may be considered an adverse action. Its contrary argument in the retaliation section of its brief is not on point and bears no relationship to the heading of "Plaintiff has failed to prove Defendant took an adverse action that a reasonable employee would have found materially adverse." Doc. #28 at p. 11.

Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001).  Otherwise, "plaintiff must offer additional evidence to establish causation."  Id.

Plaintiff concedes that Tenth Circuit law consistently holds that an adverse employment action that happens more than three months after the protected activity is not entitled to a presumption of causation.  Hysten v. Burlington N. & Santa Fe Ry., 296 F.3d 1177, 1183-84 (10th Cir. 2002); Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (three-month separation did not destroy causal connection but simply failed to establish such a connection by itself). However, the passage of time does not necessarily bar a retaliation claim if plaintiff establishes additional evidence of a retaliatory motive.  Evidence of a pattern of discriminatory conduct can establish that defendant took the adverse employment action after a lengthy period of time in response to the earlier, protected activity.  See Marx v. Schnuck Mkts., Inc., 76 F.3d 324, 329 (10th Cir. 1996) ("We have recognized that protected conduct closely followed by adverse action may justify an inference of retaliatory motive," but "the phrase 'closely followed' must not be read too restrictively where the pattern of retaliatory conduct begins soon after the [protected action] and only culminates later in [the adverse employment action].").

Defendant argues that plaintiff cannot show a causal connection because the January 25, 2011 HND Deputy Director hiring decision came nearly four months after plaintiff began FMLA leave on September 27, 2010.  Plaintiff measures an even longer five-month period from the date she notified her supervisors that she would take FMLA leave until the date of the hiring decision, and she acknowledges that such a span of time does not entitle her claim to a presumption of causation.  However, plaintiff then points out that less than two months passed from the date she notified her supervisors of her impending leave until Speaker decided to "open the position to external candidates rather than promoting Plaintiff."  Doc. #34 at 15.  Plaintiff asserts that, viewed in the light most favorable to her, a reasonable jury could find that Speaker had already determined

-9-

not to promote plaintiff when he decided to post the position externally.[6] The Court disagrees. The uncontroverted evidence is that Speaker delayed posting the vacancy announcement until plaintiff could be present for the interviews because he knew she was interested in the position; that in consultation with the City's Human Resources department, Speaker decided to have two panels interview the candidates and make recommendations; and that Speaker decided not to participate in either panel so that he would not influence the decision. Thus, as a matter of law, because the two actions were too remote in time, plaintiff is not entitled to a presumption that taking FMLA leave caused defendant to offer the HND Deputy Director position to someone else.

The Court next considers plaintiff's argument that defendant engaged in a pattern of discriminatory behavior. First, plaintiff asserts that Speaker's demeanor toward her was noticeably different after she took her leave. She testified that while he had formerly stopped by her office to talk with great frequency, he barely spoke to her after she returned from leave. In addition, he no longer invited her to attend extra meetings. Plaintiff offers no evidence, however, as to how Speaker treated other department employees. Viewed in the light most favorable to plaintiff, this change in Speaker's conduct does not amount to a pattern of discriminatory behavior.

Second, plaintiff argues that a pattern of discrimination is also evidenced by defendant violating its own internal procedures regarding promotion. Plaintiff points to a section of the City of Topeka Personnel Code which states as follows:

> Vacancies in higher positions in the classified service shall be filled when possible by promotion from current City employees in lower classifications. Performance evaluations shall serve as one of the relevant factors to determine favorable candidates for promotion.

---

[6] Plaintiff also asserts that little more than three months passed between the date she commenced her FMLA leave "in early October" and when she was "informed in early January 2011" that she did not receive the Deputy Director position. Doc. #34 at 15. Her dates are incorrect. She began her leave on September 30, 2010, and Speaker told her on January 25, 2011 that she did not get the job. That is nearly four months.

Doc. #34-4 at p. 37. Plaintiff points out that she was qualified for the position and that her performance evaluations in the two most recent years indicate that she met or exceeded expectations. She then argues that "[d]espite this, and the numerous assurances [she] has received from both Speaker and Rooney regarding her forthcoming promotion to the Deputy Director position, Topeka violated its own policy regarding promotion." Doc. #34 at p. 16. The evidence does not match plaintiff's argument. Plaintiff admitted that Rooney had no authority to hire her as his successor and that Rooney never told her that he was training her for the position. And although plaintiff argues that Speaker gave assurances, she offers no evidence that Speaker ever told her that she would be promoted to the Deputy Director position. The only evidence is to the contrary; Speaker testified that he could not recall ever having a conversation with plaintiff about moving into the Deputy Director position after Rooney retired, or any conversation with Rooney about training plaintiff for the position or moving plaintiff into the position after Rooney retired. Doc. #38-1 at p. 5.

Plaintiff offers no evidence of defendant's promotion policy beyond this language from the Code. The quoted language is not a guarantee that all City jobs will be filled through promotion. Instead, the Code states that higher positions will be filled by promotion "when possible." The only record evidence is the uncontroverted affidavit and testimony of Human Resources Director Russell, who states that defendant does not have any policy or procedure that requires departments to promote from within. Doc. #28-2 at p. 1. She states that for higher management positions, the City goes through a competitive internal and/or external selection process and employs a best practice of using a panel to interview candidates. Doc. #28-3 at pp. 2, 4, 5. With respect to this position, Speaker testified that he met with the City Manager to discuss the level of the position and the need for the person filling it to interact with other City departments and neighborhood organizations, and then he decided to fill the position through City posting and public advertising. Doc. #28-4 at p. 2. In light of the evidence, plaintiff's argument that defendant violated its own promotion policy and that

-11-

such violation constitutes a pattern of discriminatory conduct fails as a matter of law.

Because plaintiff fails to show a causal connection between taking FMLA leave and not being promoted, she does not meet her burden of showing a prima facie case of retaliation. Even if she had met her burden, however, the Court concludes that plaintiff has not demonstrated that defendant's proffered reason for failing to promote her is pretextual. Defendant states that it did not choose plaintiff for the HND Deputy Director position because another candidate was better qualified. Plaintiff relies on five pieces of circumstantial evidence from which she argues that a reasonable jury could find retaliation. First, plaintiff argues that Russell's explanation of City policy with respect to promotion is unworthy of belief because it contradicts the City Personnel Code language discussed above. The Court rejects this argument because no contradiction exists.

Second, plaintiff asserts that a jury could find unworthy of belief Speaker's explanation that he chose Reiff because he was more qualified than plaintiff. She argues that she has more experience in handling necessary federal grants, more certifications, a real estate license and she was already participating in many of the Deputy Director's duties. While the Court accepts plaintiff's statements as to her own qualifications, they do not refute the panels' and Speaker's assessment of the quality of Reiff's qualifications. Speaker testified that Reiff was most qualified for the position because of his understanding of federal programs, his ability to take on new programs, his ability to interact with neighborhood organizations successfully and to be perceived as a positive influence for them. Doc. #34-3 at p. 5. Reiff also had worked extensively in real estate development and financing. Id. at p. 6. Reiff had held the positions of HOME[7] Program Director and Director of Policy and Planning for the Kansas Housing Resources Corporation for nearly six years when he applied for the HND Deputy Director position. For almost six years before that, Reiff served as the

---

[7] HOME is a federal program that provides housing for 650 low-income households in Kansas. Doc. #34-11 at p. 5.

-12-

HOME Rental Development Program Manager, and before that he spent nearly three years in the Topeka HND Department as a Community Resource Specialist. Doc. #34-11 at pp. 6-7. The Court has no basis to dispute Reiff's qualifications.

Third, plaintiff asserts that a jury could find unworthy of belief Speaker's assertion that Reiff is more qualified because of his neighborhood experience and that working with neighborhood groups is a substantial part of the Deputy Director position. Plaintiff points to the City's written description of the position, which she contends indicates that communication with the public regarding housing and neighborhood development constitutes five per cent of the Deputy Director's duties. Plaintiff's reading of the position description is not entirely accurate. Because the position is within the City's Housing and Neighborhood Development Group, it understandably "involves planning and implementing redevelopment and revitalization projects" for the City, including managing a number of federal and state housing programs "and all real estate relate [sic] functions and other special grants to ensure compliance with federal regulations, City Codes and requirements." Doc. #34-5 at p. 1. Actually, only 18 per cent of the position's duties and responsibilities do not directly involve neighborhood development. The Court concludes that plaintiff's third ground is not supported by the record.

Plaintiff argues that a separate fourth piece of circumstantial evidence is that defendant acted contrary to its Personnel Code. The Court has already considered and rejected this contention.

Finally, plaintiff asserts that defendant departed from its normal policy and practice by having two panels interview candidates, and that a reasonable jury could find that the use of two panels was essentially a sham. Plaintiff's argument is nonsensical. Speaker's uncontroverted testimony is that he suggested two panels, one composed of City personnel and the second composed of neighborhood group representatives, because whoever occupied the position would be working closely with both City agencies and neighborhood groups. Speaker did not choose the individuals

who served as representatives of the neighborhood groups and he did not attend or otherwise participate in the interviews. The panels asked the same questions of all candidates. At the conclusion of the interviews, each panel met with its members only, ranked the candidates and passed along those rankings to Speaker. Both panels ranked Reiff as their first choice. No evidence supports plaintiff's theory that defendant's use of two interview panels demonstrates that the City's reason for hiring Reiff was a pretext for retaliation.

For the foregoing reasons, the Court grants summary judgment on plaintiff's FMLA retaliation claim.

**II.     Disparate Treatment**

As to discrimination, plaintiff alleges that defendant failed to promote her to the Deputy Director position on the basis of her gender. Defendant argues that plaintiff's gender discrimination claim is barred because (1) plaintiff's gender was not a substantial or motivating factor in the decision not to promote her to the HND Deputy Director position and (2) defendant had no intent to discriminate.

Title VII prohibits intentional employment discrimination on the basis of gender. 42 U.S.C. § 2000e-2(a)(1). Plaintiff bears the initial burden to make a prima facie showing of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a facially nondiscriminatory reason for its actions. Reynolds v. Sch. Dist. No. 1, Denver, Colo., 69 F.3d 1523, 1533 (10th Cir. 1995). If defendant articulates a legitimate nondiscriminatory reason, the burden shifts back to plaintiff to present evidence from which a reasonable jury might conclude that defendant's proffered reason is pretextual, that is, "unworthy of belief." Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995)).

Plaintiff alleges that she was subject to disparate treatment, which occurs when an employer

-14-

treats a particular person less favorably than others because of a protected trait. Williams v. Potter, 331 F. Supp. 2d 1331, 1342 (D. Kan. 2004). To prevail on her disparate treatment claim under Title VII, plaintiff must show that defendant's discrimination was intentional. See Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1207 (10th Cir. 1999). Plaintiff may make a prima facie case by showing that (1) she belongs to a protected class, (2) she suffered an adverse employment action and (3) the adverse employment action occurred under circumstances which give rise to an inference of discrimination. Freeman v. Spencer Gifts, Inc., 333 F. Supp.2d 1114, 1129 (D. Kan. 2004).

Plaintiff does belong to a protected class and defendant acknowledges that failure to promote her was an adverse employment action. Plaintiff does not articulate a theory as to how Reiff's selection occurred under circumstances which give rise to an inference of discrimination, except to argue that the decision-maker was male and Reiff is a male. No inference follows. Even if plaintiff had satisfied those three elements, she offers no evidence from which the Court could conclude that defendant's discrimination was intentional. As a matter of law, plaintiff has not articulated a prima facie case of gender discrimination.

Even if plaintiff had set forth a prima facie case, defendant has articulated a facially nondiscriminatory reason for its actions. Plaintiff offers circumstantial evidence that defendant's proffered reason is pretext in the form of the same five pieces she argued as to retaliation. For the same reasons, the Court rejects her argument.[8]

---

[8] The Court notes that as a matter of public policy, the citizens of Topeka were well-served by a process that was intended to land the most qualified candidate in a City position. Speaker knew that plaintiff was interested in the job and it is obvious that he did not doubt her qualifications. He waited until she had returned to work to post the position so that she would be available for the interviews. Together with the Human Resources Department, Speaker determined that two interview panels would be more probative of all of the skills and experience the position demanded. He intentionally absented himself from the interview process so as not to influence the decision. Both panels chose the same person as most qualified. Speaker adopted their recommendation. While the Court is sensitive to plaintiff's expectations that she was in line for the job, the record does not support her accusation that in choosing Reiff the City retaliated against her

For the foregoing reasons, the Court grants summary judgment on plaintiff's Title VII disparate treatment claim.

**IT IS THEREFORE ORDERED** that Defendant City Of Topeka's Motion For Summary Judgment (Doc. #27) filed March 30, 2012 be and hereby is **SUSTAINED**.

Dated this 21st day of August, 2012 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge

---

or treated her differently than similarly situated males.